

**FILED**

AUG  4 2014

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Aureus Asset Managers, Ltd., successor in
interest to Minster Insurance Company, Ltd.
21 New Street
London EC2M 4TP
ENGLAND

and

Riverstone Insurance (UK), Ltd., successor
in interest to Sphere Drake Insurance, Ltd.
Park Gate
161-163 Preston Road
Brighton BN1 6AU
ENGLAND

No. ____  14- 703C

       Plaintiffs,

       v.

THE UNITED STATES

       Defendant.

## COMPLAINT

Plaintiffs, Aureus Asset Managers, Ltd. ("Aureus") and Riverstone Insurance

(UK), Ltd. ("Riverstone") by their undersigned counsel, as and for their Complaint

against Defendant United States ("United States" or "Defendant"), hereby allege that the

United States deprived them of their property without paying them just compensation in

violation of the U.S. Constitution.  The United States' actions deprived Plaintiffs of a

legally cognizable claim before the United States federal court system.  Plaintiffs allege

as follows:

## NATURE OF THE ACTION

1.      In violation of the Just Compensation Clause of the Fifth Amendment of the United States Constitution, the United States took the property of Aureus and Riverstone in the form of their legally cognizable Foreign Sovereign Immunities Act claims against the government of Libya ("Libya") for its role in the destruction of Egypt Air Flight 648 on November 23, 1985.  The United States' actions in furtherance of restoring "normal" relations with Libya directly resulted in the taking of Plaintiffs' judicially cognizable claims against Libya.

2.      After Libyan-sponsored terrorists destroyed Egypt Air Flight 648 in 1985 and Pan Am 103 in 1988, killing hundreds of civilians, Plaintiffs as reinsurance companies for the aircraft and airline faithfully adhered to the governing insurance agreements for each terrorism-caused disaster.

3.      Aureus and Riverstone were damaged in the amount of approximately $1,208,964.24 in performance of their contractual obligations resulting from the destruction of the Egypt Air Flight 648 aircraft hull.

4.      Plaintiffs obtained a right to pursue relief against the primary tortfeasor that caused the destruction of Egypt Air Flight 648.  Plaintiffs then sued Libya under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, in a case[2] which was terminated by the actions of the United States government, described below in 2008.  By terminating Plaintiffs' judicially-cognizable legal rights without any recourse or possibility of any compensation whatever, the United States has insulated Libya from responsibility for the cost of Libyan-sponsored terrorism, instead forcing Plaintiffs to

_____

[2] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731 (GK) (D.D.C. filed April 21, 2006).

bear the expense of compensating the victims of this carnage with no means of indemnification.

5. That Plaintiffs had a right to compensation from Libya is beyond doubt. The U.S federal court in *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya* rendered a decision against the government of Syria, Libya's co-conspirator[4] subsequent to the United States' deprivation of Plaintiffs' claim against Libya in that case. If the plaintiffs in *Certain Underwriters at Lloyd's London* are entitled to damages against Syria, then they were entitled to damages against Libya as well, damages which they could not pursue due to the United States' taking of their property.

6. Plaintiffs regret being forced to seek compensation from the United States, but they now have no other means of redress. But for the intervention of the United States, Plaintiffs would have a U.S. federal court judgment against Libya. Plaintiffs' primary objective is to hold Libya accountable for the actions of its former government. Accordingly, Plaintiffs remain open to a negotiated solution which would obviate the necessity to seek damages directly from the United States. Until the United States indicates a willingness to pursue such alternative dispute resolution, Plaintiffs bring this claim for just compensation as required by the Just Compensation Clause of the Fifth Amendment.

## JURISDICTION

7. This is an action for money damages to recover just compensation under the Fifth Amendment of the United States Constitution for the taking of Plaintiffs'

---

[4] 811 F. Supp 2d 52 (D.D.C. 2011) (entering a judgment of damages against Syria for its role in the Egypt Air attack which were subsequently revised to $51,574,997.89).

property. Specifically Plaintiffs seek compensation for the taking of a judicially cognizable claim against Libya for its sponsorship of international terrorism which caused the complete destruction of the Egypt Air Flight 648 on November 23, 1985, the victims and policy holders of which were compensated by Plaintiffs according to Plaintiffs' contractual obligations under various insurance policies. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Fifth Amendment of the United States Constitution.

## THE PARTIES

8.      Plaintiff Aureus is an asset management entity organized and existing under the laws of the United Kingdom.  Aureus is the successor in interest to Minster Insurance Group, Ltd. ("Minster"), which it acquired 100% of during Minster's voluntary liquidation on December 22, 2010.  Minster was a plaintiff in the federal lawsuit against Libya under the Foreign Sovereign Immunities Act to recover payments made in accordance with liability insurance coverage for the hull of Egypt Air Flight 648.

9.      Plaintiff Riverstone is an insurance provider organized and existing under the laws of the United Kingdon.  As another provider of liability insurance coverage for the hull of Egypt Air Flight 648, Riverstone was a co-plaintiff of Minster in their action against Libya for the recovery of costs caused by the destruction of the Egypt Air Flight 648 aircraft hull.

10.      Defendant is the United States, the actions of which deprived Plaintiffs of valuable property without just compensation.

## FACTUAL HISTORY:
## AN ACT OF LIBYAN SPONSORED TERRORISM

11.     The factual history that pertains to Plaintiffs Aureus's and Riverstone's property interest in a valid claim against Libya arising from the Hull Destruction of Egypt Air Flight 648 ("Flight 648"), a Boeing 737-200 ADV passenger airplane, with registration number SU-AYH and serial number 211191, is described in Paragraphs 12-24, infra.

12.     The government of Libya, and also separately the government of Syria, sponsored and supported the Abu Nidal Organization ("ANO") (a/k/a Black September, the Fatah Revolutionary Council, the Arab Revolutionary Council, the Arab Revolutionary Brigades, the Revolutionary Organization of Socialist Muslims), a known terrorist organization, headed by Sabri al-Banna (a/k/a Abu Nidal), prior to November 23, 1985.

13.     The Defense Intelligence Agency of the United States Department of Defense, and other intelligence agencies of the United States government, determined that the hijacking of the Egypt Air Flight 648, on November 23, 1985 was conducted by members of the terrorist organization ANO, and that the organization and act were sponsored by (a) the government of Libya, which provided general and specific material support for ANO, and by (b) the government of Syria, which provided general material support for ANO and its terrorist members.

14.     The United States Department of State, Office of the Historian, Bureau of Public Affairs, in its report of Significant Terrorist Incidents, 1961-2001, lists the Egyptian Air Flight 648 hijacking and destruction of November 23, 1985 as a terrorist act that was conducted by ANO.

15.     The United States Department of State's Office of Counterterrorism's Background Information on Foreign Terrorist Organizations indicates that ANO received considerable support, including safe haven, training, logistic assistance, and/or financial aid from Libya and Syria.

16.     The substantial material support to and sponsorship of ANO by Libya included, but was not limited to, provision of the following: weapons; funds; facilities; airline tickets; free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO; terrorist training in Libyan camps; use of the privilege of Libya's "diplomatic pouch" freight privileges to transport the weapons used by the ANO hijackers; official documents of all kinds, including the Tunisian passports that allowed the ANO hijackers to travel; and actual operational assistance in pre-positioning of people and supplies for the conduct of the hijacking of Flight 648.

17.     On or about November 13, 1985, ANO terrorist Omar Rezaq traveled from Beirut to Athens for the express purpose of participating in an ANO mission to hijack an airplane. Then on November 23, 1985, three ANO operatives, including Rezaq, used illegal passports, provided to them by Libya for the purpose of hijacking the plane, to board Egypt Air Flight 648.

18.     Shortly thereafter, Flight 648 took off from Athens and headed in a southeasterly direction toward Cairo, its intended destination. Twenty-two minutes into the flight ANO terrorists hijacked the plane. A mid-flight shootout between an Egyptian Sky Marshall and one of the hijackers resulted in the death of a hijacker, the wounding of the Sky Marshall, and two stewardesses, as well as the piercing of the fuselage. After this shootout, Flight 648 was diverted to Malta.

6

19.     The tower in Malta ordered Flight 648 to taxi to a remote parking area, after which four police buses then blocked both ends of the runway. The terrorists demanded that the Maltese airport authorities refuel the plane, and the Maltese airport authorities refused to comply with the terrorists' demands. The terrorists threatened to shoot one passenger every fifteen minutes unless the Maltese agreed to refuel the plane.

20.     Thereafter, the terrorists identified two Israeli women and shot each of them in the head. The terrorists threw them out of the plane and onto the tarmac. Next, the terrorists brought three American passengers to the front of the plane, shot each in the head, and threw them out of the plane onto the tarmac.

21.     Twenty-four hours after the hijacking began, while the aircraft was still on the ground in Malta, Egyptian commandos stormed the plane in an attempt to rescue the passengers. The Egyptian commandos entered the plane by destroying the passenger doors and the luggage compartment doors with explosives. These explosions caused the internal plastic of the plane to catch fire, causing widespread suffocation.

22.     When the hijackers realized that they were being attacked, they threw hand grenades into the passenger area, killing and injuring passengers and igniting a fire inside the aircraft.

23.     As a result of (a) the mid-flight shootout with the Egyptian sky marshal, (b) fire from the use of explosives by the Egyptian Commandos, and (c) the use of hand grenades by the terrorists, the airplane was damaged beyond repair and ceased to be suitable for any purpose beyond salvage.

24.     Because of the catastrophic financial risk associated with insuring an airline, no single insurer or group of insurers is financially able to insure the entire risk.

Rather, an airline obtains coverage using a "vertical placement," with each insurer or group of insurers assuming an enumerated percentage of the airline's risk. Plaintiffs Minster and Riverstone provided reinsurance for the aircraft hull and this event triggered the coverage in their policies. Riverstone provided .823% and Minster provided 1.029% of the liability insurance coverage which paid for the losses caused by the destruction of Egypt Air's Boeing 737, which was insured for $14 million.[5] The insurers sustained additional reasonably foreseeable losses during the subsequent investigation of the loss, such as storage of the destroyed hull and legal fees.[6]

## PLAINTIFFS' LEGALLY COGNIZABLE CLAIMS AGAINST LIBYA AND THEIR DEPRIVATION BY THE UNITED STATES

25.     In 1996, amendments to the Foreign Sovereign Immunities Act lifted Libya's sovereign immunity in relation to its state sponsorship of terrorism. On April 26, 2006, Minster (Aureus' predecessor in interest), Riverstone and other insurers filed a lawsuit[9] in the U.S. District Court for the District of Columbia against the governments of Libya and Syria to recover payments made pursuant to their insurance of the Egypt Air Flight 648 aircraft hull.

26.     However, beginning in and around 2007, the United States in furtherance of its stated public policy of "normalizing" relations between the United States and Libya, a public purpose within the meaning of the Fifth Amendment of the United States Constitution, began a coordinated effort to take Plaintiffs' claims. Paragraphs 27 to 40, infra, enumerate the mechanisms by which the United States executed this taking.

---

[5] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731(GK), Docket No. 109 at 17, 18-19, (D.D.C. May 14, 2012).
[6] *Id.* at 17-18.
[9] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731 (GK) (D.D.C. filed April 21, 2006).

27.     On August 4, 2008, Congress passed the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008) ("LCRA") which stripped the District Court of its subject matter jurisdiction over Plaintiffs' lawsuit against Libya for the act of terrorism that caused the destruction of the Egypt Air Flight 648.

28.     On August 14, 2008, the United States and Libya entered into a Claims Settlement Agreement[11], calling for the "termination of all pending suits" against Libya for "death, or property loss caused by" an act of "extra judicial killing, aircraft sabotage . . . or the provision or material support or resources for such an act . . . ."

29.     On October 31, 2008, President George W. Bush issued Executive Order No. 13,477 pursuant to LCRA terminating all terrorism-related suits against Libya pending in United States courts.[12] In furtherance of this objective, this order instructed the Attorney General to seek the dismissal with prejudice of any terrorism-related claims against Libya.

30.     In addition, Executive Order No. 13,477 announced the United States' espousal of terrorism-related claims by United States nationals and ordered the Secretary of State to establish procedures to compensate those United States nationals for their terminated claims.

31.     Executive Order No. 13,477 provided no such parallel procedure for the claims of foreign nationals.

32.     On March 16, 2009, the United States submitted a Statement of Interest in Minster's and Riverstone' Egypt Air Flight 648 case, arguing that LCRA and Executive

---

[11] *Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya*, 2008 U.S.T. Lexis 72, entered into force Aug. 14, 2008.
[12] Executive Order No. 13,477, 73 Fed. Reg. 65965, 65965-56 (Oct. 31, 2008).

Order 13,477 required that the case be dismissed.[13] In its Statement of Interest the United States (a) conceded that it sought termination of Plaintiffs' claims and (b) stated its public purpose of "normalizing" relations between the United States and Libya.

33. On January 7, 2010, the District Court, citing the March 16, 2009 Statement of Interest, dismissed Minster's and Riverstone's claims with prejudice for lack of subject-matter jurisdiction, stating "Congress has deprived the courts of the United States of jurisdiction over these claims. . . . That is the end of the matter."[14]

34. The eventual award against Libya's co-defendant, Syria, totaled $51,574,997.89 including pre-judgment interest.[15] But for the taking of Plaintiffs' claims by the United States, Libya would be jointly and severally liable for that judgment.

35. By letters dated December 11, 2008 and January 15, 2009, pursuant to LCRA and Executive Order No. 13,477, the Department of State referred the claims of United States citizens against Libya to the Foreign Claims Settlement Commission. The Foreign Claims Settlement Commission imposed the "continuous nationality rule" although the Claims Settlement Agreement, the Libyan Claims Resolution Act, the Executive Order and the Referral letters did not mention the principle. On the basis of the "continuous nationality rule", the requirement that claims be held by United States nationals from the time of the internationally wrongful act until the espousal of the claim

---

[13] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya,* No. Civ. 06-731 (GK), Docket No. 84 (D.D.C. March 23, 2009).

[14] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya,* No. Civ. 06-731 (GK), Docket No. 94 at 11 (D.D.C. Jan. 7, 2010) *quoting Antolok v. United States,* 873 F.2d 369, 375 (D.C. Cir. 1989).

[15] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya,* No. Civ. 06-731(GK), Docket No. 120 (D.D.C. May 14, 2012).

by the United States, the Foreign Claims Settlement Commission rejected all the claims by those Plaintiffs before it.

36.    Given the Commissions' guidelines regarding the "continuous nationality rule" and its numerous and unambiguous rejection of claims by foreign applicants, Minster and Riverstone declined to submit an application regarding their claims against Libya stemming from the Egypt Air Flight 648 attack.  New York Marine and General Insurance Co., their sole United States co-plaintiff in their federal court case against Libya, did submit an application that the Commission eventually rejected.

37.    On June 5, 2012 the Commission issued a Proposed Decision finding that it had no jurisdiction over New York Marine's claims on the theory that those claims were originally held by Egypt Air, the owner of the aircraft hull, even though at the time of the aircraft hull destruction New York Marine had a contractual obligation to pay Egypt Air for that loss.

38.    New York Marine requested that the Commission reconsider the Proposed Decision, but on Feb 15, 2013 the Commission entered a final ruling that it could not assert jurisdiction over New York Marine's claims

39.    The United States has deprived Minster and Riverstone of their property, the lawsuit against Libya, without any remedy in either federal court or the Foreign Claims Settlement Commission.  This federal government has worked an unprecedented total extinguishment of jurisdiction over previously valid claims at law.

40.    When the Commission used the "continuous nationality rule" to reject jurisdiction over Plaintiff's claims, it extinguished those claims.  This was not the case under the Iran-United States Claim Tribunal, created by the Algiers Accord.  Declaration

of the Government of the Democratic and Popular Republic of Algeria, Jan. 19, 1981, 20 ILM 224 (1981).  Under Executive Order 12294, President Reagan merely "suspended" claims in the federal court system.  Executive Order No. 12,294, 46 Fed. Reg. 14111 (Feb. 24, 1981).  Claims rejected by the Tribunal on a jurisdictional basis were "revived" in federal court.  Thus, the Algiers Accord did not maroon any claimants without a forum in which to have their grievances heard, as happened to Plaintiffs.

## CLAIM FOR RELIEF
### Count One: Unconstitutional Taking of Claims Regarding the Hull Destruction of Egypt Air Flight 648

41.     Plaintiffs Aureus and Riverstone re-allege and incorporate by reference paragraphs 1-40.

42.     Plaintiffs seek compensation from Defendant for the taking of their private property for public use without just compensation.  The United States' passage of LCRA, and subsequent failure to create alternative channels for the remuneration of foreign nationals, constitutes a taking of Plaintiffs' property interest in viable, judicially-cognizable claims against Libya for the stated public purpose of creating an international agreement to "normalize" relations between the United States and Libya.  Such conduct, without just compensation, violates the Just Compensation Clause of the Fifth Amendment of the United States Constitution.

43.     Plaintiffs are entitled to just compensation as a result of the taking of their property, valid, judicially cognizable claims against Libya.

WHEREFORE, Plaintiff prays for judgment against the Defendant, the United States, as follows:

12

25

A.     Recovery in the amount to be determined at trial representing just compensation for the

taking of Plaintiffs' claims against Libya, together with prejudgment and post judgment

interest, costs, and attorneys' fees; and,

B.     Such further relief as the Court deems just and proper.

August 4, 2014                                    Respectfully Submitted,

Steven R. Perles
Edward MacAllister
PERLES LAW FIRM, PC
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202-955-9055
Telefax:     202-955-3806
Attorneys for Plaintiffs                          Email: sperles@perleslaw.com